## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 20 2020, 8:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of:

G.C. *(Minor Child)*
and

C.C. *(Mother)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

August 20, 2020

Court of Appeals Case No.
19A-JT-1982

Appeal from the Adams Circuit Court

The Honorable Chad E. Kukelhan, Judge

Trial Court Cause No.
01C01-1806-JT-31

**Robb, Judge.**

# Case Summary and Issue

[1] C.C. ("Mother") appeals the termination of her parental rights to her minor child and presents the sole issue of whether the juvenile court's order terminating her parental rights was clearly erroneous. Concluding it was not, we affirm.

# Facts and Procedural History

[2] Mother and A.K. are the biological parents of G.C. ("Child"), born November 30, 2016. Mother's husband, K.C., is Child's legal father.[1] Mother has another child, R.C., who is not the subject of this appeal, but is relevant. In 2014, the Wells County Department of Child Services ("DCS") opened a child in need of services ("CHINS") case regarding R.C. due to Mother's drug use. Mother was not compliant with services throughout the case and, around June 2016, Mother voluntarily terminated her parental rights as to R.C.

[3] Months later, on November 30, 2016, the local DCS office in Adams County received a report from Bluffton Regional Hospital that Mother had just given birth to Child and the hospital had concerns about Mother's ability to care for Child. Mother tested negative for drugs upon admission to the hospital and Child's meconium test was negative. Mother had been arrested in February

---

[1] Ultimately, Child's biological and legal fathers both voluntarily relinquished their parental rights to Child. *See* Appellant's Appendix, Volume II at 29-31, 35-36. Accordingly, we have limited our recitation of the facts to those pertaining solely to Mother except as necessary.

2016 for possession of a hypodermic needle, possession of paraphernalia, and resisting law enforcement. Mother was incarcerated from April to August 2016. Ultimately, she pleaded guilty, was sentenced, and placed on probation. However, shortly after her release, Mother was arrested for possessing marijuana, heroin, and paraphernalia and was incarcerated until mid-November, about three weeks prior to Child's birth.

[4] At the time Child was born, Mother's previous CHINS case remained open and DCS family case managers ("FCM") Danielle Reed and Taylor Evans contacted Mother's prior case manager to obtain background information before visiting Mother in the hospital. The case manager advised them that Mother failed to complete any services in the CHINS case and voiced concerns over Mother's drug use and missed drug screens. Reed and Evans also learned from hospital staff that Mother had a positive drug screen,[2] had been recently arrested for possession of marijuana and heroin while pregnant with Child, and during several prenatal visits, Mother stated she intended to give Child up but later stated she planned to give custody of Child to a friend in Ohio. In addition, Child had stopped gaining weight toward the end of Mother's pregnancy due to substance abuse.

[5] On December 1, the day after Child was born, Reed and Evans went to the hospital to speak with Mother; however, Mother was extremely hostile and

---

[2] It is unclear from the record when Mother had the positive drug screen.

initially refused to speak with them – stating that "her past doesn't matter and that she was not going to give [them] any information." Transcript, Volume 1 at 49. Eventually, Mother agreed to speak with them. Mother stated she was living on First Street in Decatur, which was different from the Ohio address she provided to the hospital, did not have a job, and was serving a three-year probation sentence. Mother told the case managers it was "not any of [their] business" who she was living with or how she was going to provide for Child. *Id.* She also refused to tell them what supplies she had for Child and indicated she would not participate in their Healthy Families program and would refuse any service. During the conversation, Mother's behavior escalated, and hospital staff asked Reed and Evans to leave.

[6] After talking with Mother, the case managers went to the residence in Decatur where Mother had reported she was living. An unknown man answered the door and refused to let them inside the house; he was unaware of Mother's whereabouts but believed she had last been at the house on November 30.

[7] Ultimately, DCS had "a lot of concerns with [Mother's] previous history and not being able to ensure safety once [C]hild left" the hospital. *Id.* at 51. As a result, DCS determined that Child needed to be removed and filed a petition for an emergency custody order with the juvenile court. On December 2, the juvenile court granted DCS' petition; Child was removed and placed in foster care.

[8] On December 6, DCS filed a petition alleging Child was a CHINS. An initial/detention hearing was held the same day during which the juvenile court entered a denial on behalf of Mother. At a fact-finding hearing on February 7, 2017, Mother admitted Child was a CHINS and agreed she would benefit from services. The juvenile court adjudicated Child a CHINS and appointed a guardian ad litem ("GAL").

[9] Following a hearing on May 16, the juvenile court entered a dispositional order requiring Mother to (among other things): successfully complete an Intensive Family Preservation Program; participate in home based counseling; complete a parenting assessment, substance abuse assessment, and domestic violence assessment and complete all recommendations and treatment; complete a psychological evaluation and any recommendations; meet with medical/psychiatric personnel and take the proper dosage of all prescribed medications; maintain suitable housing and income; attend all scheduled visitation; refrain from using illegal substances or alcohol; obey the law; submit to random drug screens; and follow all terms of her probation. *See* Exhibits, Volume 1 at 62-67. DCS referred Mother to case management services, supervised visitation, psychological assessment, family centered treatment ("FCT"), and a batterer's intervention program with the Center for Nonviolence. DCS did not refer Mother to substance abuse treatment because she had already been referred through the probation department, which sent its reports to DCS.

[10]   Mother completed her substance abuse assessment through Park Center in Wells County, as well as the required two NA or AA meetings. Mother later moved to Adams County where she continued treatment. Adams County required an additional three NA or AA meetings, but Mother refused to participate in the extra meetings. Park Center recommended that Mother participate in and complete the accepting responsibility group and sixteen-week recovery group. Mother failed to complete both programs.

[11]   Mother completed the clinical interview and assessment portion of the psychological assessment but never completed the psychological testing. Mother also began FCT, a four-phase program focusing on changing family interactions. Mother completed the first phase, but then missed appointments and had fewer visits with Child. Mother was often angry and defensive, which interfered with treatment. Ultimately, FCT was unsuccessfully closed out sometime during the summer of 2017.

[12]   On May 30, Mother tested positive for THC during a random drug screen for probation. *See id.* at 73. Mother's probation was revoked in June and she was arrested. Months later, Mother tested positive for Ultram, for which she did not have a prescription; her probation was revoked again, and she was arrested. Mother was sentenced to serve the remainder of her two- and one-half-year sentence at the Indiana Department of Correction. Mother was initially placed in the Madison Correctional Facility through the Department of Correction; however, she was written up fifteen times for various conduct issues and was

later transferred to maximum security at the Indiana Women's Prison for failing to acclimate.

[13] Following a review hearing on November 3, 2017, the juvenile court issued an order finding that Mother had been partially compliant with the case plan "until she violated her probation[,] a warrant was issued for her arrest[,]" and she was reincarcerated. *Id.* at 54. Another review hearing was held on March 9, 2018. The juvenile court found that Mother had not been compliant with the Child's case plan as she remained incarcerated and unable to complete services. The juvenile court also found that the conditions that led to Child's removal from Mother had not been alleviated and Mother had not enhanced her ability to fulfill her parental obligations. In June 2018, the juvenile court issued an order finding the same but also that Mother has continued to struggle with substance abuse and has failed to demonstrate she is able to meet Child's needs. *See id.* at 33-34.

[14] On September 11, the juvenile court held a permanency hearing and subsequently entered an order changing Child's permanency plan from reunification to adoption. DCS filed its Verified Petition for Involuntary Termination of Parent-Child Relationship between Mother and Child on November 7.

[15] Mother was released from prison in March 2019. She had been incarcerated for approximately sixteen months during which time she completed several classes addressing various topics such as parenting, substance abuse, anger, and

improving your life. Following Mother's release, DCS referred Mother to supervised visitation, home based case management, substance abuse classes, and medication valuation. Mother complied with services by attending her appointments, submitting to random drug screens, re-engaging in home based casework, completing a substance abuse evaluation, and attending visitation with Child. Prior to and after being incarcerated, Mother maintained employment with EP Graphics. Mother did not, however, enroll in a batterer's intervention program.

[16]  The juvenile court held a fact-finding hearing on May 3, 2019, and took the matter under advisement. Several weeks later, DCS filed its Motion to Reopen Case in Chief alleging that since the May 3 hearing, Mother had been arrested in Ohio and was being held for the illegal conveyance of drugs of abuse into jail and possession of criminal tools. The juvenile court granted DCS' motion and held a hearing on July 17 during which additional evidence concerning Mother's recent criminal charges was presented. *See id.* at 120-124. On July 24, the juvenile court issued its order terminating Mother's parental rights and finding, in pertinent part and including the specific findings that Mother challenges:

> A.  Facts Relating to Initial Removal of Child, CHINS Adjudication & Dispositional Order
>
> * * *

6. During the course of the assessment regarding Child's wellbeing by DCS in November/December 2016 Mother was combative and hostile toward DCS staff. Mother did not have a plan to care for [C]hild and when DCS visited the home [M]other identified there were no supplies located in the home for [C]hild.

\* \* \*

B. Facts Relating to Child's Continued Removal from Parent's Home and Care[.]

\* \* \*

3. Mother has an extensive history of drug use; [M]other testified that she has used illegal drugs for seventeen years.

4. Mother has a history of criminal activity and criminal convictions, including:

    a. Purchase of More Than 9 Grams of Precursor in a Month[.]

    b. Battery[.]

    c. Possession of Paraphernalia, Resisting Law Enforcement, and Unlawful Possession of a Syringe[.]

    d. Failure to Appear[.]

\* \* \*

7. On December 1, 2016 DCS went to the home Mother identified as her address and there were no supplies or preparations for the Child.

8. On December 1, 2016 DCS attempted to address Child's weight loss and feeding concerns with Mother and she disregarded the concerns. Mother reported she had discussed Child's care with his pediatrician but could not identify who the Child's pediatrician was. DCS attempted to connect Mother with Healthy Families and she reported she was unwilling to participate in community resources. Mother's behavior escalated and the Child had to be taken from Mother's arms due to her behavior.

\* \* \*

10. Mother initially participated in [FCT], one of the most intensive services DCS can offer a parent. The service began in March 2017 and was closed unsuccessfully in June 2017. The FCT worker, Megan Cox, testified that Mother was discharged due to progress not being made in the FCT program. Mother was slow to complete the first of four phases of FCT due to her aggression and defensiveness. The second phase addresses making change and Mother was unable to progress through the second phase. Mother began missing appointments, had a brief incarceration and had a positive drug screen. Ms. Cox testified that due to the slow progress by Mother and the lack of consistency FCT was closed out.

\* \* \*

12. Mother last participated in the supervised visitation during the first week of September 2017. On September 18, 2017 Mother cancelled her visitation. The foster parents

cancelled the visit on September 22, 2017 due to Child having a fever. On September 26, 2017 the caseworker transported Child to the visit and Mother called to cancel the visit. On September 28, 2017 Mother reported she had a warrant and was unsure of the visit, she did not confirm the visit.

\* \* \*

18. Mother was released from incarceration on March 11, 2019 and attended the termination hearing originally scheduled for March 19, 2019. Mother completed a drug screen on March 21, 2019 and attended intake evaluations for substance abuse treatment and medication management. The Court ordered DCS to provide visitation following Mother's compliance for two weeks with services. Mother has not participated in a psychological evaluation and has not participated in batterer's intervention services.

19. Mother has a history of methamphetamine and heroin use. Mother testified that she is currently receiving the vivitrol shot and received the pill form of vivitrol while incarcerated. Mother reports that the vivitrol blocks her cravings for opiates as long as she continues to receive the shots. Mother reports she does not have cravings for methamphetamine.

20. Mother contends that she had been sober for two years during her incarceration. Mother has only demonstrated two months of sobriety since her release from incarceration.

21. On cross examination of Mother by her attorney, Mother reported that her anger is not a problem for her. Mother

has not addressed her history of domestic violence and ongoing conduct issues. [FCMs], service providers and the [GAL] testified that Mother was extremely combative and they were unable to ensure child safety or move forward with services during periods when Mother was free from incarceration.

22. During the time Mother was free from incarceration she did not maintain stable housing. During the first ten months of the case Mother had four different homes she reported staying at. Mother maintained employment at EP Graphics prior to her incarceration and resumed employment following incarceration. Despite the steady employment Mother was unable to maintain independent or stable housing. Mother is currently residing in a friend's home.

23. Mother has not completed domestic violence education, substance abuse treatment, psychological evaluation or medication evaluation.

24. The participation by Mother in services while free from incarceration and during incarceration has been plagued by a continued cycle of criminal activity and substance abuse.

* * *

30. Based on Mother['s] unwillingness to address underlying issues of substance use and anger, and inability to demonstrate stability, DCS [FCM], Gwendolyn Gaddy, testified that adoption and termination of parental rights is in [Child's] best interest. [GAL], Beth Webber's testimony echoed that adoption and termination of parent rights is in Child's best interest. The GAL has ongoing concerns that

> Mother's lack of willingness to follow rules and maintain appropriate conduct in a structured jail setting causes significant concern that Mother is unlikely to remedy the concerns in a less structured setting.

Appealed Order at 2-3, 7-12 (record citations omitted).  Based on these findings, the juvenile court concluded there is a reasonable probability that the conditions that resulted in Child's removal and continued placement outside of Mother's care will not be remedied and the parent-child relationship poses a threat to Child's well-being.  The juvenile court also concluded that termination of Mother's parental rights is in Child's best interest and DCS has a satisfactory plan for Child, namely adoption.  *See id.* at 14.  Mother now appeals.[3]

# Discussion and Decision

## I.  Standard of Review

The right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution.  *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.*  The law provides for the

---

[3]On August 23, 2019, the juvenile court appointed the public defender's office to represent Mother on appeal. The same day, Mother filed her notice of appeal.  However, on January 14, 2020, this court dismissed the appeal with prejudice for failure to timely file the Appellant's Brief.  *See* Appellant's App., Vol. II at 61.  The public defender's office filed its Acceptance of Appointment and Formal Notice of Appointment of Outside Counsel stating it had not received notice of the appointment or any communication regarding Mother's appeal and appointing Kimberly Jackson as counsel to seek reinstatement of and perfect Mother's appeal. *See id.* at 62-63.  The juvenile court concurred and formally appointed Ms. Jackson as Mother's appellate counsel.  Mother subsequently filed a Motion to Reinstate Appeal and this court granted the motion and ordered Mother's brief due within thirty days.

termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id*. The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

[18] When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 534

U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[19] The juvenile court entered findings of fact and conclusions thereon as required by Indiana Code section 31-35-2-8(c), and we therefore apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

## II. Statutory Framework for Termination

[20] To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires DCS to prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been
> adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of
> the child.

DCS must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However, because subsection (b)(2)(B) is written in the disjunctive the juvenile court need only find one of those three elements has been proven by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

# III. Findings of Fact

[21] As noted above, the juvenile court's judgment contains specific findings of fact and conclusions thereon. Therefore, we must first determine whether the record contains evidence supporting the challenged findings either directly or by inference. *In re A.S.*, 17 N.E.3d 994, 1002 (Ind. Ct. App. 2014), *trans. denied*. Mother argues that seven of the juvenile court's findings are clearly erroneous. Specifically, she challenges findings A.6., B.7., 8, 10, 12, 18, and 21.

[22] Mother only challenges the portions of findings A.6. and B.7. concerning DCS' visit to Mother's home on December 1, 2016 in which the juvenile court found that there were no baby supplies at the home. Mother contends that "DCS

agents were not allowed to enter the home" and there is no evidence in the record that the home lacked supplies for Child. Brief of the Appellant at 17. Mother is correct. Testimony reveals that DCS went to Mother's home, an unknown male answered the door, and he would not let them in. Therefore, DCS was unable to determine whether Mother had baby supplies or not. DCS concedes, and we agree, there is no evidence in the record to support this portion of findings A.6. and B.7. and therefore, they are clearly erroneous.

[23] In finding B.8., the juvenile court found that when DCS visited Mother in the hospital, Mother's "behavior escalated and the *Child had to be taken from Mother's arms* due to her behavior." Appealed Order at 8 (emphasis added). Mother contends this finding is clearly erroneously because the hospital staff asked the DCS FCMs to leave the room because they had upset Mother. FCM Reed testified that, while talking with Mother in the hospital, Mother became "pretty worked up, everyone was making sure, because originally she was holding [Child], was asked to put him back into the bassinet . . . because of how she was escalating with her behaviors[.]" Tr., Vol. 1 at 50. Contrary to the juvenile court's finding, the record establishes that Child was not physically removed from Mother's arms. This portion of the finding is clearly erroneous. However, the substance of the finding – that hospital staff and DCS were clearly concerned Child may be harmed as a result of Mother's escalating behavior – remains the same whether Child was physically removed from Mother or whether the staff asked Mother to put him down.

[24] Next, Mother challenges the juvenile court's characterization of FCT, contained in finding B.10., as "one of the most intensive services DCS can offer a parent" as clearly erroneous because the record only supports a finding the FCT is "intensive." Appealed Order at 8; Br. of the Appellant at 18. We agree this portion of the finding is erroneous as there is no evidence in the record to show that FCT is anything other than an intensive program.

[25] Mother argues finding B.12., that Mother cancelled her September 26, 2017 visit with Child, is clearly erroneous. In September 2017, Sarah Derosett, family consultant at Lifeline Youth and Family Services, received a referral to supervise Mother's visitation with Child. From the middle to end of September, Mother had six scheduled visits. Derosett testified that of these, Mother attended two visits but the other four were cancelled. *See* Tr., Vol. 1 at 75. On September 26, Derosett picked Child up for the scheduled visit; however, she received a call from the FCM that Mother had stated "if she didn't get her own supervised time . . . she didn't want to visit at all[.]" *Id.* at 76. As a result, Derosett transported Child back to his foster family. We conclude the juvenile court's finding that Mother cancelled the September 26 visit is a reasonable interpretation of this evidence. Therefore, finding B.12. is not clearly erroneous.

[26] In finding B.18., the juvenile court found that Mother "has not participated in a psychological evaluation [or] batterer's intervention services." Appealed Order at 10. Mother contends that the juvenile court found that she had not participated in these services since her release from prison, which "erroneously

suggests [she] had the opportunity to participate [when i]n reality, the FCM failed in her duty to refer Mother to those services" after her release. Br. of the Appellant at 18. As part of the dispositional order, Mother was ordered to complete a psychological evaluation and domestic violence services. *See* Exhibits, Vol. 1 at 62- 67. DCS then put in referrals for these services. At the May 3 hearing, FCM Gaddy testified that, to her knowledge, Mother had not engaged in the batterer's intervention program or scheduled the second part of her psychological evaluation. *See* Tr., Vol. 1 at 103. Contrary to Mother's argument, the juvenile court did not actually find that *since her release* she failed to participate in the psychological evaluation or batterer's intervention services; the juvenile court simply found she did not participate in these programs. The evidence in the record supports this finding because Mother failed to complete the second part of the psychological assessment and never engaged in batterer's intervention services. Therefore, this portion of the finding is not clearly erroneous and does not erroneously suggest that the FCM failed to refer Mother to these services.

[27] With respect to finding B.21., the juvenile court found that FCMs, service providers, and the GAL all "testified that Mother was extremely combative and they were unable to ensure child safety or move forward with services during periods when Mother was free form incarceration." Appealed Order at 11. Mother argues she "progressed at times when she was not incarcerated, although sometimes her negative behaviors slowed progress." Br. of the Appellant at 19. The following evidence in the record supports this finding:

- Megan Cox, the FCT clinician, testified that Mother's anger, frustration, and defensiveness interfered with treatment and treatment goals. *See* Tr., Vol. 1 at 70.

- FCM Laurie Hoffacker handled Mother's case until July 2017. With respect to child and family team meetings, FCM Hoffacker testified that "[m]ost of them ended with [Mother] being very . . . explosive, very irritated, verbally abusive, so we were able to hold some but then they didn't normally end well." *Id.* at 86. In general, Hoffacker stated, when "[Mother] interacted with me or DCS staff, . . . her demeanor was very angry, she was very verbally aggressive[.]" *Id.* at 87-88.

- The GAL, Beth Webber, testified Mother had trouble listening to others; she stated that Mother "wanted to do it her way and unfortunately because of that, she hasn't completed any of the services that were ordered under disposition." *Id.* at 129.

Based on this evidence, we cannot conclude finding B.21. is clearly erroneous.

In sum, portions of findings A.6., B.7., 8, 10 are clearly erroneous; the remaining challenged findings are not clearly erroneous. Notwithstanding the erroneous findings, however, as discussed below, we conclude that DCS presented sufficient evidence to support termination of Mother's parental rights and the unchallenged findings support the juvenile court's judgment. *See In re A.S.*, 17 N.E.3d at 1003-06 (holding that despite several clearly erroneous

findings of fact, DCS presented sufficient evidence to support termination of parental rights even absent the erroneous findings).

# IV. Conclusions of Law

## A. Remedy of Conditions

[29] The juvenile court concluded there is a reasonable probability that the conditions resulting in Child's continued placement outside Mother's care will not be remedied. Mother challenges this conclusion and argues "by the time of the first termination of parental rights hearing, [she] had addressed the issues which led to the initial and continued removal of" Child. Br. of the Appellant at 20. We disagree.

[30] In determining whether such conditions will be remedied, we engage in a two-step analysis: "First, we must ascertain what conditions led to [Child's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted). With respect to the second step, a juvenile court assesses whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied by judging the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). The juvenile court must also balance a parent's recent improvements against habitual patterns of conduct to determine the likelihood

of future neglect. *Id.* Habitual conduct may include criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence of whether conditions will be remedied. *A.D.S v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied.* DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change." *In re I.A.,* 903 N.E.2d at 154.

[31] We begin with the conditions that led to removal or reasons for placement outside of the home. Child was initially removed from Mother due to DCS' concern that Mother had been using drugs, incarcerated for most of her pregnancy, and was unprepared to care for Child. Child remained outside of Mother's care due to her substance abuse, incarceration, and non-compliance with services. We conclude that the evidence in the record supports the juvenile court's conclusion that there is a reasonable probability that the conditions that led to Child's removal and continued placement outside of Mother's care will not be remedied.

[32] Although Mother had a few brief periods of compliance, overall, she was non-compliant with services. FCM Hoffacker was assigned to Mother's case from December 2016 to July 2017. Hoffacker referred Mother to case management services, supervised visitation, psychological assessment, FCT, and a batterer's intervention program, all of which were ordered in the dispositional decree. *See*

Tr., Vol. 1 at 82. At the fact-finding hearing, Hoffacker testified that Mother completed the first step of the psychological assessment in March 2017 but did not complete the second step, namely the psychological testing. *Id.* Mother also participated in FCT and completed the first phase; however, she then missed several appointments and the service was unsuccessfully closed out. *See id.* at 92. Mother did engage in home based counseling; however, Hoffacker described Mother's attendance with the home based case manager as "pretty sporadic[.]" *Id.* at 89.

[33] With respect to the batterer's intervention program, Hoffacker stated that Mother did not engage in that program while she had the case. Instead, Mother "had given [her] a couple of excuses saying that she couldn't attend the classes because of the timing of them but then she also was angry that [DCS was] bringing up something that had happened in the past." *Id.* at 82. Ultimately, Hoffacker did not consider Mother to be in compliance with services for the following reasons: Mother tested positive for marijuana several times; she missed visits with Child and had not progressed to unsupervised visitation; she violated probation and was incarcerated for a brief period; she lived in four different homes and therefore, failed to maintain stable housing; and she failed to complete the psychological testing and was not addressing her mental health issues. *See id.* at 85-86. Similarly, FCM Gaddy, who was assigned Mother's case in February 2018 while Mother was still incarcerated, testified that even prior to Mother's incarceration, Mother did not successfully complete services.

[34]    At the fact-finding hearing, the GAL testified that she believes Mother "can hold it together for short periods of time [but cannot] hold it together for long periods of time and maintain that stability." *Id.* at 129. She also testified that Mother's pattern of non-compliance was very concerning:

> It's a huge concern [because Child] has spent two and a half years of his life in limbo in licensed foster care and so knowing that that's her pattern of behavior, I believe that pattern will continue. Past behavior is the best predictor of future behavior and so knowing that that's what has happened and that she's had periods of time where she's committed crimes and been incarcerated, where she's followed through with services and then not followed through with services, that's going to continue most likely to be her pattern.

*Id.* at 131.

[35]    Mother has been incarcerated throughout most of the CHINS and termination proceedings. In fact, the record reveals that Mother was incarcerated for eighteen of the twenty-two months that Hoffacker had the case. *See id.* at 96. Furthermore, Mother was initially placed in a minimum security correctional facility through the Department of Correction but was eventually transferred to the Indiana Women's Prison because she had been written up for fifteen conduct issues. As the juvenile court found, "Mother's lack of willingness to follow rules and maintain appropriate conduct in a structured jail setting causes significant concern that Mother is unlikely to remedy the concerns in a less structured setting." Appealed Order at 12.

[36]   In the short period of time between her release in March 2019 and the hearing in May, FCM Gaddy put in new referrals for Mother. Mother engaged in the substance abuse referral, attended appointments, participated in drug screens and home based casework, and visitation. At the time of the May 3 hearing, Mother was compliant with services and had obtained suitable housing. However, shortly thereafter, DCS learned that Mother had been incarcerated in Ohio and had been charged with the illegal conveyance of drugs of abuse onto grounds of a specified governmental facility and possession of criminal tools. Despite a brief period of compliance, Mother again fell back into a pattern of criminal activity, which only serves to highlight Mother's failure to remedy her instability and inability to care for Child.

[37]   Mother argues the juvenile court's conclusion that there is a reasonable probability the conditions that resulted in Child's removal will not be remedied is erroneous because it "was based on speculation that [she] would not maintain her sobriety and diligence in pursuing services and a proper home environment for [Child]." Br. of the Appellant at 21. The juvenile court's conclusion is rooted in Mother's behavior over the last two and a half years illustrating her continued substance abuse, incarceration, and instability, not speculation. In determining whether conditions are likely to be remedied, a juvenile court is entrusted with "balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d at 643 (internal quotation omitted). The juvenile court has the discretion to weigh a parent's prior history

more heavily than any recent improvement. *Id.* And "[r]equiring [juvenile] courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.* This is exactly what the juvenile court did here. It weighed Mother's past behavior (i.e., her pattern of instability) more heavily and determined that it was the best predictor of her future behavior, a task solely within its discretion.

[38] This court has often noted that evidence of a parent's "pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210. Unfortunately, such is the case here. Over the two and one-half years, Mother has demonstrated a pattern of non-compliance with services, incarceration, drug use, and overall instability that is unlikely to be remedied. For these reasons, we conclude the juvenile court's findings support its conclusion.[4]

## B. Best Interests

[39] "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). To determine the best

---

[4] Mother also contends the juvenile court erred in finding that the continuation of the parent-child relationship poses a threat to the well-being of Child. *See* Br. of the Appellant at 21-22. Having concluded the evidence is sufficient to show a reasonable probability the conditions resulting in Child's continued placement outside of Mother's care will not be remedied, we need not consider whether the parent-child relationship poses a threat to Child's well-being. *See In re L.S.*, 717 N.E.2d at 209.

interests of the child, the juvenile court must look beyond the factors identified by DCS and to the totality of the evidence. *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004), *trans. denied*. In doing so, the juvenile court must subordinate the interests of the parent to those of the children involved and need not wait until a child is irreversibly harmed before terminating parental rights. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). Recommendations of the FCM and the GAL that parental rights should be terminated support a finding that termination is in the child's best interest. *In re A.B.*, 887 N.E.2d 158, 170 (Ind. Ct. App. 2008).

[40] Here, the GAL and FCM Gaddy both testified that termination of Mother's parental rights is in Child's best interests. *See* Tr., Vol. 1 at 13, 104, 129. The GAL expressed her concern that Mother has only been able to demonstrate a pattern of being able to maintain stability and comply with services for short periods of time. *See id.* at 129. She testified that Child has been in foster care for two and one-half years and needs permanency, which "would be adoption by the people that he's been with that he knows as his parents, the current licensed foster parents and so from my perspective, it's in the best interests of this child that termination of parental rights occur and that he be allowed to be adopted." *Id.* In addition, FCM Gaddy echoed the GAL's testimony, stating that "[b]eing that it has been awhile [sic] and I know a lot of times since [Child] has been in the foster care since day one, he has formed a bond with [his foster parents]. He is a part of their family. My recommendation, [DCS'] recommendation would be for him to stay with them for adoption." *Id.* at 104.

Based on this evidence, we conclude that DCS proved by clear and convincing evidence that termination of Mother's parental rights would be in Child's best interests. *In re A.B.*, 887 N.E.2d at 170.

# Conclusion

[41]     DCS presented sufficient evidence to support the juvenile court's order terminating Mother's parental rights. Therefore, the order was not clearly erroneous, and the judgment of the juvenile court is affirmed.

[42]     Affirmed.

May, J., and Vaidik, J., concur.